## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DETLEF SOMMERFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 3025 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| THE CITY OF CHICAGO and | ) | |
| SERGEANT KNASIAK #1841, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION & ORDER

Plaintiff Detlef Sommerfield, a patrol officer in the Chicago Police Department ("CPD"), brought this action under 42 U.S.C. §§ 1981 and 1983 against the City of Chicago ("the City") and Sergeant Lawrence Knasiak. This is the second of two cases ("the 2006 case" and the "2008 case") that Sommerfield has filed against the City and Knasiak; he litigated the 2006 case to a final judgment. All claims against the City in this case having been dismissed, *see Sommerfield v. City of Chi.*, No. 08 C 3025, 2009 WL 500643 (N.D. Ill. Feb. 26, 2009), only the two counts against Knasiak remain. Sommerfield alleges that Knasiak repeatedly harassed him and otherwise discriminated against him on the basis of his race, religion, and national origin, and that Knasiak retaliated against him after he complained about the harassment. Count VI is a 42 U.S.C. § 1983 claim for violations of the First and Fourteenth Amendments, and Count VII is a 42 U.S.C. § 1981 claim for racial discrimination. Knasiak has moved for summary judgment on both counts. The court grants the motion in part and denies it in part.

### I. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56;

*Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is called for when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

In addition to complying with the Federal Rules of Civil Procedure, the parties must also adhere to the Local Rules for the Northern District of Illinois and this court's Standing Order Regarding Motions for Summary Judgment. The court discussed these rules at length in its September 20, 2010, order in the 2006 case. (Case No. 06 C 3132, Order Sept. 20, 2010, at 6-8, ECF No. 494.) Unfortunately, it is necessary to repeat that discussion here. Local Rule 56.1 provides that the moving party shall serve and file:

> 1) any affidavits and other materials referred to in Fed. R. Civ. P. 56(e);
>
> 2) a supporting memorandum of law; and
>
> 3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law . . . .
>
> The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph.

L.R. 56.1(a). The party opposing summary judgment is required to respond with its own supporting evidence, memorandum, and "concise response to the movant's statement . . . ." L.R. 56.1(b). The opposing party's Rule 56.1 statement should also contain "any additional facts that require the denial of summary judgment." *Id.* The opponent must include references to its supporting materials. *Id.* This court's Standing Order makes clear that all argument must be

contained in the party's brief, not in the Rule 56.1 statement. Standing Order at 1-2. The court may deny a motion for summary judgment for failure to comply with the rules.

Here, just as in the 2006 case, the parties have not complied with the procedures set out in Rule 56.1. Each of the numbered paragraphs in Knasiak's Rule 56.1 statement contains numerous facts and record citations, while Sommerfield has loaded up his response to Knasiak's Rule 56.1 statement with improper argument and additional facts. The court denied Knasiak's motion to strike Sommerfield's filings, given the age of the case and, to quote the order from the 2006 case, the court's lack of "confidence that a second round of briefing would improve the situation." (Order Sept. 20, 2010, at 8.) Instead, the court will disregard the improper portions of the filings. Generally, although Sommerfield "disputes" many of Knasiak's facts, he fails in many instances to cite record evidence demonstrating the dispute, as required by Local Rule 56.1(d)(3)(B)-(C). In those instances, the court deems the fact admitted. Where Sommerfield states that he denies "the implication" of a listed fact or does not dispute a fact but instead argues that an action was taken for retaliatory purposes, the court deems the fact admitted. Similarly, where Sommerfield includes additional facts in his response that do not bear on whether a dispute exists as to the fact listed by Knasiak, the court ignores the additional facts, which should instead have been listed in his statement of additional facts.

## II. Undisputed Facts & Procedural History

### A. Undisputed Facts

The following facts are undisputed for purposes of Knasiak's motion for summary judgment, except as otherwise noted. Sommerfield has been a patrol officer with the CPD since July 5, 1994. He was assigned to the 008th District of the CPD from December 10, 1998, until

approximately August 13, 2007, when he was transferred to the 001st District. He served on the third watch. Sommerfield's national origin is German, and his religion is Jewish.

Sergeant Knasiak was one of Sommerfield's senior officers, along with Lieutenant Carson Earnest (who served as watch commander about 50% of the time), Sergeant John Maciejewski, Sergeant Christine Pickering Deierl, and Sergeant Betty Woods. Knasiak was a sergeant in the 008th District from August 1997 until he retired on June 15, 2007. Knasiak worked the third watch from about January or February 1999 until approximately 2001, when he was moved to the second watch. Knasiak was reassigned to the third watch for approximately two to three months in 2004; he then returned to the second watch until his retirement.

1. Knasiak's Verbal Harassment of Sommerfield

Sommerfield contends that Knasiak repeatedly attacked him verbally for being German and Jewish. He quotes twenty-five such remarks in his own affidavit, but he does not identify the dates—or even the years—when the remarks were made. (Pl.'s Statement of Facts ("SOF") Ex. 6 (Sommerfield Aff. Sept. 29, 2009), ECF No. 191-8.) In his deposition, Sommerfield also stated that Knasiak told him "he would get" him about "about three or four times" after he filed an internal complaint against Knasiak in March 2004. (Pl.'s SOF Ex 1 (Sommerfield Dep.) 49:21 – 50:18, ECF No. 191-3.) Officer Galassi testified at deposition that he heard Knasiak say "Burn Jew, Burn" once during roll call, but he did not remember when the remark occurred. (Pl.'s SOF Ex. 17 (Galassi Dep.) 32:7-15, ECF No. 192-13.) Former police officer John Minich stated in an affidavit that he heard Knasiak abuse Sommerfield regarding his nationality and religion, but he did not identify any specific dates. (Pl.'s SOF Ex. 19 (Minich Aff.) at ¶¶ 16-18, ECF No. 192-15.) During his deposition, Knasiak denied making any of the statements.

4

2. <u>Patrol Duties and Partner Assignments</u>

Sommerfield claims that Knasiak discriminated against him by requiring him to work in high crime areas by himself and not assigning him a partner. Patrol duties in high-crime areas are part of a CPD patrol officer's job. Sometimes patrol officers are not assigned a partner because of manpower allocation and other factors. Primary beat cars working the midnight watch must be manned by at least two officers if possible. Knasiak testified that "[o]n the afternoon and midnight watch, the beats are manned by two people" (Pl.'s SOF Ex. 4 (Knasiak Dep.) 20:2-4, ECF No. 191-6), and that "[a] police officer will not be forced to work [alone] during those hours" (*Id.* at 21:11-14).

Sommerfield worked as a relief officer in the 008th District. Relief officers are not assigned a specific car, but instead fill in cars that are short an officer. The watch commander on duty makes the decision as to which officers will be relief officers and which officers will be assigned a regular beat car.

Sommerfield worked without a regular partner at various points in time. He was not the only CPD officer who did so. Sommerfield also worked with partners at times. Officer Abdallah Abuzanat was a patrol officer assigned to the third watch in the 008th District from Summer 2000 until September 2004. He was "[q]uite often" assigned as Sommerfield's partner during approximately one-and-a-half of the four years he was in the 008th District. (Def.'s SOF Ex. 12 (Abuzanat Dep.) 50:11-16, ECF No. 180-12.) He was assigned to a beat car with Sommerfield for "about four to six months." (*Id.* at 51:3-5.) Officer Edward Burger worked the third watch in the 008th District from approximately July 2003 to October 2005. During that time, he worked with Sommerfield "more than once a week." (Def.'s SOF Ex. 13 (Burger Dep.) 102:5, ECF No. 180-13.)

The parties dispute whether, as a sergeant, Knasiak had any authority over whether Sommerfield was assigned a partner. Sommerfield acknowledged during his deposition that "ultimately it is the watch commander's choice" who receives which duties and partners. (Sommerfield Dep. at 34:3-4.) But he further testified that "[i]f a watch commander isn't there, which . . . happened a lot . . . . whoever is in charge that day, depending on rank . . . really makes the ultimate call." (*Id.* at 37:13-24.)

Sergeant Deierl, who was assigned to the 008th District on August 1, 2000, and also works the third watch, testified that a sergeant would handle roll call if the watch commander was unable to attend. (Pl.'s SOF Ex. 8 (Deierl Dep.) 171:12-16, ECF No. 191-11.) Sommerfield testified that Knasiak told him once during roll call that he would be working in a high crime neighborhood by himself. (Sommerfield Dep. 34:8-24.) He admitted however, that he did "not know who made the decision," only that it was Knasiak "who told me what my assignment for the day is." (*Id.* at 34:14-24.) On another occasion, he and his partner were split up in the middle of a shift, and he "assume[d]" that Knasiak had made the decision. (*Id.* at 36:4-5.) Once, he stated, Knasiak assigned him to watch a parking lot by himself. (*Id.* at 52:12-20.)

Lieutenant Earnest, a lieutenant and watch commander in the 008th District from 2003 to 2009, testified that the watch commander had the "final say so" on who was assigned partners. (Def.'s SOF Ex. 9 (Earnest Dep.) 148:4-14, ECF No. 180-9.) Lieutenant Earnest testified that an officer would not be assigned to work by himself unless he agreed to it. (*Id.* at 143:20-22.) He testified that the determination was made by the watch commander. (*Id.* at 145:24 – 146:1.) Lieutenant Earnest also stated, however, that the decision as to who would get a partner for the beat cars was at "the discretion of the supervisors," who were either sergeants or the watch commander. (*Id.* at 138:18-20.) Knasiak testified that he did not give input to a watch

6

commander as to the staffing of any cars or as to whether Sommerfield should have a partner. (Knasiak Dep. 116:1-9, 119:3-14.) Lieutenant Earnest could not recall whether Knasiak ever provided such input to him. (Earnest Dep. 155:15 – 156:16.)

Sergeant Maciejewski, a sergeant in the 008th District since approximately January 2004, testified that partners were assigned "[a]t the discretion of the watch commander," and that sergeants played "[v]ery little" role in determining partners, although they could make recommendations. (Def.'s SOF Ex. 10 (Maciejewski Dep.) 74:11-19, ECF No. 180-10.) He further testified that the watch commander decides who works alone. (*Id.* at 76:6-8.) Sergeant Deierl testified that assignment of officers to police cars was "up to the practice of the watch commander." (Deierl Dep. 128:4-6.) She testified that sergeants might be asked which officers should work together. (*Id*. at 129:5 – 130:16.) If an officer did not want to work alone, he could go to the watch commander, who would make arrangements to get someone in the car with him. (*Id*. at 16:14-20.) Sergeants could provide input to the watch commander as to whether an officer should get a partner and which officers were assigned permanent cars. (*Id.* at 18:18-23, 152:21 – 153:22.)

3. Hospital Duty and Use of Sommerfield's Personal Car

Sommerfield claims that Knasiak required him to perform disfavored assignments and required him to use his personal vehicle on assignments. Sommerfield testified that Knasiak assigned him to hospital duty, which he considered an undesirable assignment. (Sommerfield Dep. 52:4-5.) He testified that "people look down on you . . . because you are assigned to a hospital detail." (*Id*. at 43:18-21.) He testified that Knasiak also told him he had to take his own car to the assignment. (*Id.* 52:5-11.) Use of his personal car for police business was "not within

the department's guidelines," although he did not know whether other officers were required to use their own cars while performing hospital duty. (*Id.* at 64:10-13.)

Knasiak disputes that he had any input into these assignments. Sergeant Maciejewski testified that the watch commander decides who works hospital duty. (Maciejewski Dep. 77:17-20.) Lieutenant Earnest testified that he assigned Sommerfield to hospital duty at least once. (Earnest Dep. 153:17-18.) He did not recall getting input from Knasiak on the assignment, although he stated that he "always ask[ed]" the supervising sergeant who would be best suited for a detail. (*Id.* at 154:23 – 155:3.) Knasiak testified that he never gave a watch commander input as to who should be assigned to hospital detail. (Knasiak Dep. 129:6 – 130:9.)

4. Start Times

Sommerfield claims that Knasiak discriminated against him by continually changing the time at which he started his shift. It is common for the starting times of CPD patrol officers to change frequently. Officers' start times vary depending on their assignment for the day and other factors. According to Lieutenant Earnest, the "final decision" as to start times was made by the watch commander, who would confer with the sergeant. (Earnest Dep. 168:14-24.)

5. Disciplinary Action against Sommerfield (CR 296536)

The parties dispute whether, as a sergeant in the 008th District, Knasiak had the authority to discipline patrol officers. Knasiak claims that he had no disciplinary authority. He testified at deposition that his duties were "[s]treet supervision of beat units" and related "administrative duties." (Knasiak Dep. 36:20-24.) Sergeant Woods, who also worked the third watch in the 008th District, testified that a sergeant's duties involved "supervising personnel" and "responding to in-progress assignments." (Def.'s SOF Ex. 6 (Woods Dep.) 26:22-23, ECF No. 180-6.) The

authority to impose discipline upon a police officer ultimately rests with the Superintendent of Police.

Sommerfield contends, however, that Knasiak exercised influence over suspensions. Sergeant Deierl testified that a sergeant who witnesses an infraction or violation has authority to decide what discipline should be recommended to the District Commander, including suspension. (Deierl Dep. 84-86.) Lieutenant Earnest also testified that a sergeant could make a recommendation to the district commander as to whether an officer should be suspended, fired, or promoted. (Earnest Dep. 40:14 – 42:2.) Other sergeants testified similarly. (Def.'s SOF Ex. 8 (Flores Aff.) 2, ECF No. 180-8; Knasiak Dep. 119:18-20.) The disciplinary recommendations go to the watch commander, and then to the District Commander's office for final approval. (Knasiak Dep. 145:17-19.) Both Knasiak and Sergeant Maciejewski testified that their recommendations regarding suspensions were accepted. (*Id.* at 146:2-5; Maciejewski Dep. 31:23-32:24.)

Sommerfield contends that Knasiak discriminated against him by recommending that he be suspended after he failed to notify the police dispatcher when he changed location while working a shift. Knasiak recommended discipline for Sommerfield and his partner, Officer Abuzanat, when they were discovered at their homes during a shift. Knasiak made them come in to the watch commander's officer for questioning. (Knasiak Dep. 88:17-23.) Prior to this incident, he did not recall having any other police officer come back to the station for questioning. (*Id.* at 90:3-20.) Knasiak testified that it was a "[b]othersome habit" among patrol officers in the CPD not to notify the dispatcher when an officer changed location. (Knasiak Dep. 198:10.) Sergeant Deierl testified that the infraction could be called "inattention to duty." (Deierl Dep. 73:22-24.)

9

Discipline of a police officer may involve the issuance of a Summary Punishment Action Request ("SPAR") or a Complaint Register ("CR") number. Knasiak issued a SPAR against Sommerfield's partner, Abuzanat, for the incident. Knasiak recommended that Abuzanat receive a written reprimand. SPARs are used for twenty-seven defined "less serious transgressions" which do not require a CR number. According to CPD procedures, discipline pursuant to a SPAR is recommended by the supervising officer who witnessed or was first made aware of the transgression. The initiating supervisor must confer with the watch commander to determine the appropriate corrective action and obtain the watch commander's approval prior to sending the SPAR up the chain of command for review. Discipline for a SPAR depends on an officer's prior disciplinary history.

For Sommerfield, Knasiak recommended the initiation of a Complaint Register number ("CR") number. Knasiak recommended an investigation of Sommerfield for insubordination. (Knasiak Dep. at 68:3-5.) Insubordination is not considered one of the "less serious transgressions" for which a SPAR is appropriate. Knasiak testified that Abuzanat's "explanation and demeanor during the questioning indicated . . . that a written reprimand would serve the purpose of correcting this behavior," while "the demeanor of Officer Sommerfield was loud, argumentative, and disrespectful." (Knasiak Dep. 71:8-14.) On March 15, 2004, Knasiak initiated CR 296536 against Sommerfield because, according to Knasiak, Sommerfield "was insubordinate, failed to obey a direct order and failed to notify dispatch of relocating on an assignment." Sommerfield denies that he was insubordinate. He admits, however, that he told Knasiak he "did not like being treated like a little kid" and said something about getting a lawyer. (Sommerfield Dep. 77:10-16.)

10

Knasiak had never initiated a CR for insubordination against any officer other than Sommerfield. During his deposition, he was unable to recall any occasion on which he had recommended suspension of an officer other than when an officer had failed to appear in court. (*Id.* at 121:16-21.)

Police Officer Christopher Taliaferro of the CPD's Internal Affairs Division investigated Knasiak's allegations against Sommerfield, obtaining eleven witness reports before submitting his report up the chain of command and ultimately to CPD Superintendent Philip Cline. Taliaferro sustained the allegations that Sommerfield was insubordinate and had failed to notify dispatch when he relocated. After considering the nature of the sustained allegations and Sommerfield's history, Taliaferro recommended a ten-day suspension. Superintendent Cline issued Sommerfield a five-day suspension on June 14, 2006, on the grounds that he had "failed to notify the . . . dispatcher of his change in status and availability for immediate assignment" and "began yelling at his supervising sergeant when the sergeant attempted to question him."

6. Other CRs and Suspensions

Sommerfield was issued three CRs in addition to the one issued by Knasiak. First, on January 17, 2003, Sergeant Christopher Paluch initiated CR 287075 against Sommerfield because it was "reported that [Sommerfield and Abuzanat] failed to conduct a preliminary investigation regarding a death." Superintendent Cline issued Sommerfield a five-day suspension in relation to the incident on December 22, 2005. Second, Sergeant Kenneth Krok initiated CR 302745 against Sommerfield on December 26, 2004, alleging that Sommerfield "violated General Orders 02-05 (IV)(H), and 04-03 (IV)(A)(5) in that he responded to a homicide investigation to which he was not authorized and altered a crime scene by searching the victim while the scene was being processed." Superintendent Cline issued Sommerfield a

11

one-day suspension. Third, Denise Stewart initiated CR 305033 against Sommerfield on April 21, 2005, after a citizen complained of Sommerfield's behavior. Superintendent Cline issued Sommerfield a reprimand on July 13, 2006.

### 7. The K-9 Handler Position

Sommerfield contends that Knasiak was responsible for his being denied a promotion to become a K-9 handler in 2006 and 2007. At that time, Commander Gulliford was in charge of the K-9 unit. Lieutenant Victor Guerreri was the K-9 coordinator under Gulliford in 2007.

The process for selecting K-9 handler positions was as follows. First, the K-9 Unit created a department notice announcing an open application period, which was forwarded to the Legal Affairs, Research and Development, and Personnel divisions for approval and then returned to the K-9 Unit for revisions. Once all changes were approved, the K-9 Unit posted the notice. Candidates for the handler positions were ranked. CPD management was allowed to select 20% of the handlers without regard to how the candidates were ranked. The K-9 Unit then reviewed the list to determine which candidate(s) were sequentially next for consideration. Those names were forwarded to the Internal Affairs Division for background screening. The notice indicated that an applicant "must have an acceptable disciplinary record," and that "[t]he candidate's disciplinary record cannot reflect any sustained Complaint Register Numbers for misconduct resulting in a suspension of more than ten days, or a record of three or more sustained Complaint Register Numbers resulting in suspensions during the past five years." The Commander of the K-9 unit decides which candidates will be selected as handlers. Guerreri relied upon the list and Commander Gulliford's instructions as to the eligibility of the candidates in coordinating the appointments.

Sommerfield argues that he was eligible to become a K-9 handler in March - May 2006, when several new handlers were chosen, because at the time, he had only one sustained suspension of five days. Guerrieri confirmed during his deposition that this was true. (Guerrieri Dep. 152:10-14.) In April 2006, Sommerfield was ranked #36 on the candidate list, but the candidate ranked #41 on the list was appointed to become a handler. Guerreri testified that Sommerfield "could have been selected" to fill that position, but was not chosen. (*Id.* at 168:18-19.) Guerreri provided no explanation as to why Sommerfield was not selected.

Additional handlers were selected in January or February 2007. Sommerfield was on the list of qualified candidates, which was shown to Guerreri by Commander Gulliford. Guerreri had never heard of Sommerfield prior to reviewing the qualified list. Sommerfield's name was submitted for background screening. Commander Gulliford informed Guerreri that Sommerfield's background check indicated that he had exceeded the permissible number of sustained CRs, making him ineligible for the handler position. (Guerrieri Dep. 140:5-16.)

**B. Procedural History**

    1. <u>The 2006 Case</u>

This lawsuit has a convoluted history. In 2006, Sommerfield sued the City of Chicago for discrimination and retaliation under both Title VII and §§ 1981 and 1983. *Sommerfield v. City of Chi.*, 06 C 3132 (N.D. Ill.). His original complaint included a claim against Knasiak for intentional infliction of emotional distress, which was dismissed as barred by the statute of limitations. On August 13, 2007, Sommerfield sought leave to amend his complaint to add claims against Knasiak pursuant to §§ 1981 and 1983. His motion was denied by Judge Filip, to whom the case was assigned at the time, on August 16, 2007. Sommerfield again moved to amend the complaint to add the claims against Knasiak on February 21, 2008. That motion was

denied by Magistrate Judge Cole on March 3, 2008, who reasoned that the amendment was too late and that Knasiak would need to pursue additional discovery were he brought back into the case as a defendant, thus prejudicing the City. After the case was reassigned to the undersigned judge, Sommerfield sought reconsideration of Judge Cole's order. On April 29, 2008, this court denied the motion for reconsideration as to the claims against Knasiak, stating that adding Knasiak back into the case would delay discovery, and noting that Sommerfield had waited for over a year after Knasiak had been dismissed from the case before attempting to add the new claims against Knasiak.

Sommerfield's 2006 case thus proceeded only against the City. His Second Amended Complaint asserted five counts against the City: (I) discrimination and harassment based on religion, in violation of Title VII; (II) discrimination and harassment based on national origin, in violation of Title VII; (III) retaliation, in violation of Title VII; (IV) and (V) violations of §§ 1981 and 1983. (Case No. 06 C 3132, Second Am. Compl., ECF No. 190.)

On September 10, 2010, the court partially granted the City's motion for summary judgment. (Case No. 06 C 3132, Order Sept. 10, 2010, ECF No. 494.) Under counts I and II, the court limited the City's liability to allegations of a hostile work environment; the court held that there was no evidence that Knasiak was Sommerfield's supervisor for Title VII purposes, as required to hold the City liable for other alleged acts of discrimination. (*Id.* at 18.) The court limited Sommerfield's Title VII retaliation claim (Count III) to allegations that Knasiak verbally harassed him after he made an internal complaint against Knasiak in March 2004. As to Sommerfield's allegations that his supervisors retaliated against him in other ways, including by assigning him to hospital duty, requiring him to use his personal vehicle for work, not assigning him to a specific beat car, changing his start time, not assigning him a partner, and forcing him to

14

work alone in dangerous neighborhoods, the court found insufficient evidence to establish an issue of material fact as to whether the acts constituted retaliation. The court further held that there was insufficient evidence that Sommerfield was suspended in retaliation for his complaint against Knasiak. (*Id.* at 19.)

In counts IV and V, the court stated that Sommerfield sought redress pursuant to §§ 1981 and 1983 for "the same acts of discrimination, harassment, and retaliation alleged in the first three counts." (*Id.* at 24.) Because Sommerfield failed to establish facts supporting a policy, widespread practice, or action by a policymaker on the part of the City, as required by *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978), the City was granted summary judgment on these two counts.

A jury trial was held in the 2006 case. Although the case was assigned to this court, it was tried by Judge Leinenweber. Sommerfield argued to the jury that the City should be liable for Knasiak's harassment of him based on his religion and national origin, as well as for Knasiak's retaliation against him through verbal harassment after Sommerfield filed a complaint against Knasiak with the CPD's Internal Affairs Division in March 2004. The course of conduct at issue in both the discrimination claim and the retaliation claim was the hostile remarks allegedly made by Knasiak to Sommerfield because he was Jewish and German. With respect to the discrimination claim, the remarks allegedly began in about 1999 or 2000 and continued until Knasiak retired in June 2007. Sommerfield identified twenty remarks to the jury that he characterized as severe and pervasive harassment, and he argued at the close of the trial that the remarks rendered his work environment hostile and abusive. (Case No. 06 C 3132, Trial Tr. 1106, ECF No. 660.) Sommerfield further argued that, after he filed an internal complaint

against Knasiak, Knasiak retaliated against him by making more remarks, more often. (*Id.* at 1110.)

On March 26, 2012, judgment was entered for Sommerfield against the City "on the allegations of a hostile work environment in Count I" and for the City "on all other allegations in Count I." Judgment was entered in favor of Sommerfield "on the allegations of a hostile work environment in Count II" and for the City "on all other allegations in Count II." Judgment was entered in favor of the City on Count III, the retaliation claim. Sommerfield was awarded $30,000.00 in damages for physical and mental or emotional pain and suffering. (Case No. 06 C 3132, Order Mar. 26, 2012, ECF No. 649.) Sommerfield's attorney sought nearly $1,500,000 in fees; he was awarded $430,000. (Case No. 06 C 3132, Order Jan. 10, 2013, ECF No. 731.)

2. Previous Orders in the 2008 Case

This case is a second lawsuit filed in 2008 by Sommerfield against the City and Knasiak pursuant to §§ 1981 and 1983, after he was twice denied leave to amend his complaint in the 2006 case to add the claims against Knasiak. The claims against the City were dismissed on February 26, 2009, as duplicative of the 2006 case. (Order Feb. 26, 2009, ECF No. 45.) The court held, however, that the claims against Knasiak were not duplicative of the 2006 case because Knasiak was a party only in the 2008 case. The court noted in its order that "issues actually and necessarily decided in the first case carry over to the second under the doctrine of issue preclusion." (*Id.* at 7 (quoting *Sterling v. United States*, 85 F.3d 1225, 1229 (7th Cir. 1996).) Knasiak requested that the two cases be consolidated. The court declined to consolidate the cases, given their different procedural postures, "absent agreement of the parties." (*Id.* at 10.) Sommerfield asked the court to reject consolidation because he wanted "to prosecute the claims in the instant case fully," with "full discovery." (Pl.'s Resp. to Mot. to Dismiss 15, ECF No. 36.)

The claims now remaining in this case are a § 1983 claim of violations of the First and Fourteenth Amendments (Count VI), and a § 1981 claim of racial discrimination (Count VII). In Count VI, Sommerfield claims that Knasiak violated the equal protection clause by treating Sommerfield unequally because he was Jewish and/or German, and retaliated against Sommerfield for filing a complaint and charges of discrimination and harassment against Knasiak. In Count VII, Sommerfield claims that Knasiak violated his rights against racial discrimination. In its February 29, 2011, opinion denying a prior motion for summary judgment filed by Knasiak, the court held that Sommerfield was estopped by the determinations in the 2006 case from presenting evidence of retaliation beyond Knasiak's verbal attacks. (Order Sept. 29, 2011, ECF No. 127.)

## III. ANALYSIS

### A. Collateral Estoppel & Double Recovery (Verbal Harassment and Retaliation Claims)

As explained above, the claims remaining in this case are that Knasiak discriminated against Sommerfield because he was Jewish and German, both with verbal harassment and a series of separate actions, and that Knasiak retaliated against Sommerfield for filing an internal complaint against Knasiak. Knasiak argues that certain of these claims are barred by issue and claim preclusion because they were fully litigated to a final judgment in the 2006 case.

In the 2006 case, Sommerfield asserted three separate claims against the City:

First, Mr. Sommerfield claims that Lawrence Knasiak, a former Chicago Police Department Sergeant, harassed him based on his religion, and the City of Chicago should be held liable.

Second, Mr. Sommerfield claims that Mr. Knasiak harassed him based on his national origin, and the City of Chicago should be held liable.

Third, Mr. Sommerfield claims that Mr. Knasiak retaliated against him by subjecting him to verbal harassment after March 2004 because Mr. Sommerfield initiated an internal Chicago Police Department Complaint against Mr. Knasiak.

Mr. Sommerfield claims that the City of Chicago should be held liable for this as well.

(Case No. 06 C 3132, Jury Instructions 18, ECF No. 621.)  As stated above, on March 26, 2012, final judgment was entered for Sommerfield against the City "on the allegations of a hostile work environment" in the two discrimination claims.  Judgment was entered in favor of the City on the retaliation claim.  Sommerfield was awarded $30,000.00 in damages for pain and suffering.

1. Defensive Collateral Estoppel

Knasiak argues that Sommerfield's retaliation claim based on Knasiak's verbal attacks was fully litigated in the in the 2006 case and was defeated by the City and that Sommerfield is therefore estopped from re-litigating the claim.

Defensive collateral estoppel forecloses a plaintiff from asserting claims that the plaintiff previously litigated and lost against another defendant. *Caffey v. Mansur Grp.*, 67 F. App'x 370, 373 (7th Cir. 2003).  For the preclusive effect of a federal judgment, the court "look[s] to federal common law for the criteria governing preclusion."  *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 689 (7th Cir. 2012) (citing *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008)).  "For a federal court's ruling on a particular issue to be given preclusive effect, that issue must have been both actually and necessarily decided in the prior action."  *Id.*  As the Seventh Circuit has explained, "collateral estoppel may be used defensively by a party who was not a party to the previous suit against a plaintiff . . . who has had one full and fair opportunity to litigate a given issue."  *Easley v. Reuss*, 247 F. App'x 823, 827 (7th Cir. 2007) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 325 (1971)).

For example, in *Easley*, the Seventh Circuit held that collateral estoppel barred a claim against a police sergeant, even though he was not a party to an earlier suit by the plaintiff against

other officers and municipalities, because the earlier decision decided an issue that was dispositive of the plaintiff's claim. *Id.* at 826-27. The court explained:

> The doctrine of collateral estoppel provides that once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit involving a party to the prior litigation. *Harrell v. U.S. Postal Service*, 445 F.3d 913, 921 (7th Cir. 2006). There are four specific elements to issue preclusion: (1) the issue is the same as one involved in the prior action; (2) the issue was actually litigated; (3) the determination of the issue was necessary to the prior judgment; and (4) the party against whom preclusion is invoked was fully represented in the prior action. *Wash. Group Int'l, Inc. v. Bell, Boyd, & Lloyd LLC*, 383 F.3d 633, 636 (7th Cir. 2004).

*Id.*

Here, elements (1) and (4) of the standard set forth in *Easley* are satisfied: (1) whether Knasiak retaliated against Sommerfield through verbal attacks was or is at issue in both actions, and (4) Sommerfield was fully represented in the 2006 case. The remaining questions are whether that issue was actually litigated and necessarily decided in the 2006 case. If so, Sommerfield may not pursue his retaliation claim in this case.

To find for Sommerfield on the retaliation claim in the 2006 case, the jury had to find that Knasiak subjected Sommerfield to a hostile work environment after March 2004 because Sommerfield initiated an internal complaint against him, that the City knew or should have known about the conduct; and that the City failed to take reasonable steps to correct the situation and prevent the harassment from recurring. (Case No. 06 C 3132, Jury Instructions 27.) Knasiak argues that all issues in this case related to retaliation were actually litigated in the 2006 case. But claim preclusion does not apply to the retaliation claim because the issue at stake here— whether Knasiak subjected Sommerfield to a hostile work environment in retaliation for the internal complaint—was not necessarily decided as part of the judgment in the 2006 case. To hold the City liable for retaliation in the 2006 action, Sommerfield had to prove all three of the

elements listed above. The judgment in favor of the City did not necessarily mean that the jury found that Knasiak did *not* commit retaliation; rather, there were multiple independent bases that would have been sufficient to support the jury's verdict for the City on the retaliation claim. For example, the jury could have concluded that the City had no means of knowing about the conduct. Defensive collateral estoppel is unavailable.

2. Double recovery

Knasiak argues that Sommerfield may not recover for any injuries he suffered as a result of Knasiak's verbal attacks targeting his religion and national origin, because the verdict in the 2006 case provided Sommerfield with a recovery for those injuries, and double recovery is impermissible. Sommerfield responds that while the 2006 case involved the City's liability under Title VII, this case involves Knasiak's liability under §§ 1981 and 1983. He also argues that Knasiak was not a party to the 2006 case, nor was he in privity with the City. Therefore, Sommerfield contends, he is entitled to both a recovery against the City under Title VII and a separate recovery against Knasiak under §§ 1981 and 1983. He cites in support *Conner v. Reinhard*, 847 F.2d 384, 395 (7th Cir. 1988), in which a judgment in favor of a municipality was held not to be *res judicata* with respect to the plaintiff's subsequent claim against an individual official.

Sommerfield's argument fails to appreciate the posture of this case and the difference between the doctrine of *res judicata* and the prohibition against double recovery. In *Conner*, the plaintiff lost in his first case, but he was allowed to pursue his claim against a different defendant because the standard for liability on the second claim was different. *Id.* at 395. In the 2006 case, however, Sommerfield *prevailed* on his verbal harassment claims. The question is thus whether he can pursue a second defendant for recovery on the same injury. The court will address

whether Sommerfield is entitled to additional compensatory damages for the injury. It then considers whether additional punitive damages might be available against Knasiak which were not available against the City.

### a. Compensatory Damages

A plaintiff may not receive "separate and duplicative compensatory damages awards for the same injuries." *Hailey v. City of Camden*, 650 F. Supp. 2d 349, 358 (D.N.J. 2009); *see also Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 720 (2nd Cir. 1992); *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317 (Fed. Cir. 2003). Such a windfall is impermissible even when a plaintiff advances different legal theories of recovery. *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 218 (3d Cir. 1992). *See also Volk v. Coler*, 845 F.2d 1422, 1435-36 (7th Cir. 1988) ("Volk may not receive two recoveries for the same alleged wrongs.").

Although the claims in this case are brought pursuant to §§ 1981 and 1983 rather than Title VII, they stem from the same transaction and alleged injury at issue in the 2006 case. The Seventh Circuit applies the same standards to discrimination claims brought under Title VII and §§ 1981 and 1983. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007); *Davis v. Wis. Dept. of Corr.*, 445 F.3d 971, 976 (2006). *See also Palka v. City of Chi.*, 662 F.3d 428, 437 (7th Cir. 2011) (explaining that "an identity of the causes of action" existed in two suits, even though the second suit was brought pursuant to Title VII rather than § 1983, because the same transaction was at issue in both cases); *Czarniecki v. City of Chi.*, 633 F.3d 545, 550 (7th Cir. 2011) ("We reject [the] argument that because the operative facts needed to prove a Title VII claim and a § 1983 claim are a little different, there is no claim preclusion. That

approach would thoroughly undermine claim preclusion and would allow endless litigation as long as a lawyer could identify a slightly different cause of action.").

Normally, double recovery is avoided by disallowing plaintiffs to split their claims into multiple suits. *See Palka*, 662 F.3d at 437-38 (7th Cir. 2011). Generally, when a plaintiff is denied leave to amend claims, the proper remedy is to appeal that decision, not to file a separate lawsuit. *See, e.g.*, *Roboserve, Inc. v. Kato Kaguaku Co.*, 121 F.3d 1027, 1035 (7th Cir. 1997) (explaining that if the plaintiff "disagreed with the district court's denial of leave to amend . . ., it could have appealed that issue," and that "the district court correctly dismissed [the plaintiff's] second suit" on *res judicata* grounds). *See also Proctor & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 500 (5th Cir. 2004). As explained in a leading treatise:

> An order that denies leave to amend the pleadings to advance an additional part of a claim partially asserted might seem to fall within the principle that a plaintiff should be free to bring a second action on a theory that could not be advanced in the first action. It appears well-settled, however, that claim preclusion bars a second action on the part excluded from the first action. This result is sound . . . . There is likely to be good reason when the court that has control of the first action concludes that a party should not be allowed to advance matters so closely related to the action as to be part of a single claim. Unless the court can be persuaded to direct that denial of leave to amend is without prejudice to advancing the new matter in a separate action, preclusion should apply. Any error should be corrected by appeal in the first proceeding.

18 Fed. Prac. & Pro. § 4412; *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 329 F. Supp. 2d 574, 579 (D. Md. 2004) ("Very often, the doctrine of claim splitting applies to bar a plaintiff from filing a new lawsuit after the court in an earlier action denied leave to amend the complaint to add those claims."). *See also Smith v. City of Chi.*, 820 F.2d 916, 918 (7th Cir. 1987) ("Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or be lost.").

Here, although Sommerfield bungled his complaint in the 2006 case, he was allowed to split his claims between two suits, as the court found the claims to be different. Sommerfield had the opportunity to agree to consolidate the cases prior to the trial in the first case; he chose to oppose consolidation. (Pl.'s Resp. to Mot. to Dismiss 15, ECF No. 36.) He was warned that "issues actually and necessarily decided in the first case [would] carry over to the second under the doctrine of issue preclusion." (Case No. 06 C 3132, Order Feb. 26, 2009 at 7.) "Maintaining such a litigation strategy almost assures that at some point one of the cases will become barred by a judgment in the other; the successful party will find that all its claims and defenses have merged into the judgment, while the unsuccessful party will find that its have been extinguished." *Proctor & Gamble Co.*, 376 F.3d at 500.

After further factual development of both this case and the 2006 case, the court determines that the underlying injury alleged in this case, insofar as it is based on Knasiak's verbal harassment, is the same as that on which Sommerfield recovered in the 2006 case. Although the causes of action are different, the underlying course of conduct and alleged injuries are the same. Preclusive effect must be given to the first judgment rendered; the claims based on verbal harassment in this case have merged into the judgment in the 2006 case. Accordingly, Sommerfield may not recover additional compensatory damages against Knasiak based on his claims of verbal harassment.

The court further concludes that recovery of compensatory damages on Sommerfield's retaliation claim is also precluded by his recovery in the 2006 case. Sommerfield can pursue additional claims only to the extent that he seeks redress of a "separate harm." *Sparaco v. Lawler, Matusky, Skilly Eng'rs LLP*, 313 F. Supp. 2d 247, 252 (S.D.N.Y. 2004) (comparing breach-of-contract and copyright claims and concluding that the harm suffered was the same). In

other words, he must show that "additional actual damage flows" from the retaliatory harassment that forms the basis of his claim in this case, *id.* at 253, as distinct from the damages resulting from the harassment that formed the basis of his Title VII discrimination claim in the 2006 case.

The court has examined the evidence presented and the facts alleged by Sommerfield in this case. There are no allegations in the complaint in this case that Sommerfield suffered verbal harassment other than the discriminatory remarks. Moreover, Sommerfield does not identify when most of the remarks were made; the court thus cannot sort out which remarks were potentially "retaliatory," and which only "discriminatory." Sommerfield testified that after 2004, "there were many numerous insults and personal attacks that I certainly do not know all of the dates. But even after December 2004 there were many, many instances while walking in the hallway or coming to work or in the parking lot where he made these jokes. What some people might consider jokes. But those were insults that are not funny." (Sommerfield Dep. II 61:9-16.) As an example, Sommerfield stated that Knasiak told him, "Well, watch yourself little Jew boy. I am going to get even with you, you fucking Jew boy." (*Id.* at 61:22-24.) In his deposition, Sommerfield also stated that Knasiak told him "he would get" him about "about three or four times" after he filed the internal complaint. (Sommerfield Dep. II 49:21 – 50:18.)

Except for the remarks that Knasiak was "going to get" Sommerfield, made on "three or four" occasions, all of the remarks characterized as retaliatory were also compensable as discriminatory harassment based on Sommerfield's race and religion, and they were presented to the jury in the 2006 case as evidence of such harassment. The remarks that Knasiak was "going to get" Sommerfield are unique to the retaliation claim, but they do not in themselves support a retaliation claim. To prevail on his retaliation claim, Sommerfield must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that

would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendant's decision to take the retaliatory action. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (quoting *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)). Although Sommerfield has satisfied the first and third requirements, the few remarks that Knasiak was "going to get" Sommerfield were not a deprivation significant enough to deter First Amendment activity.

The court concludes that Sommerfield has not suffered an injury distinct from Knasiak's retaliatory harassment that could be compensated in addition to the recovery he has already received in the 2006 case for Knasiak's discriminatory remarks. Even though the claim in this case bears a different label, the pain and suffering that resulted from the harassment was the same regardless of the legal theory used to characterize Knasiak's conduct. Sommerfield is therefore precluded from recovering compensatory damages based on his retaliation claim.

### b. Punitive Damages

Sommerfield's complaint in this action seeks both compensatory and punitive damages against Knasiak. (Compl. at 13.) As a municipality, the City could not be held liable in the 2006 case for punitive damages under Title VII. *See* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (*other than a government, government agency or political subdivision*) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.") (emphasis added); *Passannati v. Cook Cnty.*, 689 F.3d 655, 677 (7th Cir. 2012) ("[T]he Sheriff's Department can be held liable for . . . harassment under Title VII, but it cannot be held liable for punitive damages.").

25

In this case, however, Sommerfield may be able to recover punitive damages from Knasiak under § 1983. *See Smith v. Wade*, 461 U.S. 30, 56 (1983); *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991) ("[P]unitive damages [may] be recovered against a government actor only in an individual capacity suit."). Punitive damages are available under § 1983 when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56. Making all factual determinations in Sommerfield's favor for purposes of the motion for summary judgment, Sommerfield has presented evidence sufficient to support a jury finding that Knasiak harassed Sommerfield in reckless or callous disregard of his right to be free from harassment in the workplace. The court concludes that Sommerfield may proceed on his claims of verbal harassment and retaliation against Knasiak to the extent that he seeks punitive damages.

## B. Additional Allegations of Discrimination

Sommerfield alleges that Knasiak discriminated against him on the basis of his religion and national origin through additional adverse employment actions: requiring him to work in high-crime areas without a partner, failing to assign him a steady partner, assigning him to hospital duty and requiring him to use his own car, changing his start times, issuing him a CR, and causing him to be denied an appointment as a K-9 handler. Sommerfield's primary argument is that these actions were taken in retaliation for the internal complaint he filed against Knasiak. The court, however, previously held that Sommerfield was estopped by the holdings in the 2006 case from presenting evidence of retaliation beyond Knasiak's verbal attacks. (Order Sept. 29, 2011.) Thus, the court considers only whether these acts constituted a violation of equal protection in violation of §§ 1981 and 1983.

26

Any person who "under the color of law" deprives a person of a right secured by the Constitution may be held civilly liable. 42 U.S.C. § 1983. The defendant "must have participated directly in the constitutional violation." *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). The Seventh Circuit instructs that 'the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection.'" *Titus v. Ill. Dept. of Transp.*, 828 F. Supp. 2d 957, 972 (N.D. Ill. 2011) (quoting *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003)). The requirements for proving discrimination are also equivalent under §§ 1981 and 1983. *Egonmwan v. Cook Cnty. Sheriff's Dept.*, 602 F.3 845, 850 n.7 (7th Cir. 2010). Thus, Sommerfield may prove a violation of §§ 1981 and 1983 either by presenting direct evidence that an adverse employment action was motivated by discriminatory animus, or indirectly through a burden-shifting approach. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 n.3 (7th Cir. 2006). The indirect method requires Sommerfield to present evidence establishing a prima facie case of discrimination by showing that he belongs to a protected class, his job performance met legitimate expectations, he suffered an adverse employment action, and another similarly situated individual not in the class was treated more favorably. *Id.* at 750-51.

With respect to each of the occurrences alleged to constitute violations of equal protection, the court first considers whether there is evidence that Knasiak participated directly in the alleged violation and whether the violation constituted an adverse employment action. If these threshold requirements are satisfied, it then considers whether Sommerfield has either presented evidence that the occurrences of which he complains were motivated by Knasiak's discriminatory animus toward his religion and national origin (under the direct method), or whether he has made out a prima facie case of discrimination with respect to the occurrence (under the indirect method).

27

1. <u>Patrol Duties and Partner Assignments</u>

As to the assignment of patrol duties and partners, Sommerfield has presented evidence that, although the watch commander decided who received which partners and assignments, a sergeant could make recommendations as to appropriate partner assignments and which officers should be assigned to beat cars. In addition, drawing all permissible inferences in Sommerfield's favor, the evidence suggests that when the watch commander was not present, a sergeant had authority to make assignments. Thus, there is a disputed fact as to whether Knasiak *could* have influenced Sommerfield's assignments by requiring him to work in high-crime areas without a partner and by failing to assign him a regular partner.

Even so, with the exception of a single occasion—when, Sommerfield testified, Knasiak assigned him to watch a parking lot by himself—Sommerfield has presented no evidence that supports an inference that Knasiak was actually responsible for the challenged assignments. He testified at deposition that Knasiak told him once during roll call that he would be working alone, but he admitted that he did not know whether Knasiak was responsible for that decision. He also testified that he "assumed" a decision to split him from his partner during a shift was made by Knasiak. (Sommerfield Dep. at 36:45.) But he had no personal knowledge of who made that decision. None of the other evidence suggests that Knasiak ever gave input into Sommerfield's partner and beat car assignments. The court concludes that, although Sommerfield believes that Knasiak could have made decisions relating to Sommerfield's assignments because Knasiak was the one who communicated the assignments to him, he has presented no evidence that Sommerfield was responsible for the assignments, as required for liability under § 1983.

As to the single instance when Sommerfield was assigned by Knasiak to watch a parking lot by himself, the court finds that Sommerfield has raised a question of fact as to whether

Knasiak was personally responsible for the assignment, through his testimony that Knasiak made the assignment. But the assignment does not constitute an adverse employment action. An adverse employment action must have been significant enough to "materially alter[] the terms and conditions of [the plaintiff's] employment." *Porter v. City of Chi.*, 700 F.3d 944, 955 (7th Cir. 2012). The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009). The evidence shows that CPD patrol officers were assigned to work alone when manpower limitations required as much, and nothing indicates that working alone while patrolling the parking lot was an unsafe assignment that required two officers. Rather, Sommerfield indicated that he felt the assignment was demeaning because it was not "police service." (Sommerfield Dep. at 52:19.) Sommerfield's unhappiness with the assignment does not elevate it to a basis for a discrimination suit. Nor has Sommerfield presented evidence that similarly situated officers outside of the protected class did not receive similar assignments.

      2.  <u>Hospital Duty and Use of Sommerfield's Personal Car</u>

Sommerfield testified that Knasiak required him to perform hospital duty and required him to use his own car. A jury could infer that Knasiak was personally responsible for these actions. But, for the same reasons discussed in the preceding paragraph, this evidence fails to demonstrate that Sommerfield suffered an adverse employment action. The evidence shows that CPD officers were regularly required to perform hospital duty, even though it was an unpopular assignment. There is no evidence that assigning Sommerfield to this duty altered the terms and conditions of his employment. Nor, again, has Sommerfield presented evidence that similarly situated officers outside of the protected class were not required to perform hospital duty or to drive to assignments in their own vehicles.

### 3. Start Times

With respect to changes in start times, Sommerfield has presented no evidence that Knasiak determined when his shifts started. The evidence shows only that a watch commander might confer with a sergeant when assigning start times. Sommerfield has failed to present evidence that Knasiak was responsible for this alleged violation.

Moreover, changes in start times do not rise to the level of an adverse employment action. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (observing that an employer's "decision to change [the plaintiff's] working hours certainly does not rise to the level of an adverse employment action" because her "pay and job title remained the same, and she suffered no significantly diminished job responsibilities"). Nor has Sommerfield presented evidence that similarly situated officers outside of the protected class were treated differently. The evidence shows that other officers' start times also changed frequently.

### 4. Disciplinary Action against Sommerfield (CR 296536)

Sommerfield has presented evidence that Knasiak was responsible for initiating a CR that resulted in his suspension, as well as evidence that Knasiak had the ability to influence a disciplinary decision. The five-day suspension constituted an adverse employment action. *See, e.g.*, *Ammons v. Chi. Transit Auth.*, No. 10 C 6353, 2013 WL 3199974, at *6 (N.D. Ill. June 21, 2013) (stating that plaintiff "suffered an adverse employment action when she received a five-day suspension"). The court therefore turns to the question of whether Sommerfield has presented evidence that the decision was motivated by discriminatory animus.[1]

---

[1]    The court analyzes this claim under the direct method because, under the indirect method, Sommerfield has failed to make out a prima facie case of discrimination. He cannot show that he was meeting the legitimate expectations of his employment, because he admits that he violated a CPD order by being at home during a shift and failing to alert the dispatcher of his relocation. Sommerfield argues that he was punished more harshly than similarly situated officers, but he

The Seventh Circuit has recently elaborated on the use of the "direct" method of proving employment discrimination:

> "Direct" proof includes both evidence explicitly linking an adverse employment action to an employer's discriminatory animus, *see, e.g.*, *Smith v. Wilson*, 705 F.3d 674, 677 (7th Cir. 2013); *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011), and circumstantial evidence that would permit the trier of fact to infer that discrimination motivated the adverse action, *see Diaz*, 653 F.3d at 587. In order to illustrate the idea that the circumstantial evidence, taken as a whole, must permit that inference, we have used the metaphor of a mosaic whose individual tiles add up to a complete picture. . . . All these cases mean is that the circumstantial evidence must be strong enough, taken as a whole, to allow the trier of fact to draw the necessary inference. Typical kinds of evidence used for this purpose include "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz*, 653 F.3d at 587. If the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate, and the plaintiff may prevail at trial even without producing any "direct" proof.

*Morgan v. SVT, LLC*, No. 12-3589, at *9-10 (7th Cir. Aug. 1, 2013).

In this case, the CR was initiated on March 15, 2004. As circumstantial evidence that the CR was motivated by discriminatory animus, Sommerfield has identified numerous remarks that he claims Knasiak made about his German-Jewish background. Such statements can support an inference of discrimination. "Isolated comments" and "stray remarks" do not suffice to show that an adverse action was the product of discrimination. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (citing *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006)). But, accepting Sommerfield's claims about the statements as true, Knasiak's

---

identifies no other officer who had a similar exchange with a sergeant and did not receive a CR. Although his partner, Officer Abuzanat, received only a written reprimand on the same occasion, the evidence shows that Knasiak based the different disciplinary recommendations on the officers' different responses to the confrontation. Therefore, Abuzanat is not a similarly situated officer who received more favorable treatment, and Sommerfield cannot satisfy this requirement of a prima facie case.

remarks went beyond isolated or ambiguous comments: they were frequent, and they were clearly discriminatory. Although Sommerfield did not identify the dates the remarks were made, his deposition testimony and affidavits indicate that the statements were made both before and after the CR was initiated. Crediting Sommerfield's allegations for purposes of the motion for summary judgment, the evidence supports an inference that Knasiak harbored animosity toward Sommerfield. This is circumstantial evidence that the initiation of the CR against Sommerfield was motivated by discrimination.

The court also considers the disparity between the written warning issued to Abuzanat and the CR initiated against Sommerfield. Knasiak contends that Sommerfield was insubordinate, but the court must credit Sommerfield's testimony that he did not yell or swear at Knasiak during the confrontation at the police station. Although Sommerfield admits that he told Knasiak he "did not like being treated like a little kid" (Sommerfield Dep. 77:10-16), and thus did not display the contrition displayed by Abuzanat when confronted with the same violation of CPD orders, a reasonable jury could find that the punishment recommended by Knasiak was disproportionate to Sommerfield's offense, and disproportionate to the type of discipline that Knasiak usually recommended for patrol officers. This constitutes additional circumstantial evidence that the recommendation of suspension was motivated by Knasiak's animosity toward Sommerfield.

As a triable issue of fact exists as to whether discrimination motivated the action, the court denies Knasiak's motion for summary judgment with respect to Sommerfield's claim that Knasiak violated his right to equal protection through the initiation of the CR.

5. <u>The K-9 Handler Position</u>

Sommerfield was not chosen for the K-9 handler position in either 2006 or 2007. The undisputed facts show that Knasiak did not participate directly in the decision not to appoint Sommerfield in 2006. Although Sommerfield presents evidence indicating that he was eligible for the position on 2006, and someone else on the list was appointed instead, there is no evidence linking Knasiak to that decision.

The decision not to appoint Sommerfield a K-9 handler in 2007 was based on the fact that he had four sustained CRs, rendering him ineligible for the position. One of those CRs was that initiated by Knasiak in 2004. Had Knasiak not initiated the CR, it is possible that Sommerfield could have been appointed a handler. Sommerfield's claim based on his failure to obtain a K-9 handler position in 2007 thus rises and falls on whether the CR itself was discriminatory in nature. As discussed above, whether the CR was motivated by discriminatory animus involves a triable issue of fact. It follows that Knasiak's motion for summary judgment must also be denied with respect to Sommerfield's claim that the denial of an appointment to be a K-9 handler violated §§ 1981 and 1983.

### V. CONCLUSION

The court concludes that Sommerfield's recovery of compensatory damages on his claims of verbal harassment and retaliation are precluded by his recovery in the 2006 case. Sommerfield may proceed on these claims to the extent that punitive damages may be available against Knasiak. The court grants summary judgment for Knasiak on Sommerfield's claims of discrimination based on the assignment of patrol duties and partners, hospital duty, and start times. Sommerfield may proceed on his claim that the initiation of the CR against him in 2004

and the failure to appoint him a K-9 handler violated  were motivated by discrimination, in violation of §§ 1981 and 1983.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   August 9, 2013